IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

VICTOR HOLM,

                Plaintiff,

v.

CAPTAIN CASIANA, LT. ANDERSON,
TRISHA ANDERSON, DR. STEGLIA and
PHILIP KERCH,

                Defendants.

OPINION AND ORDER

16-cv-794-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Victor Holm has been granted leave to proceed on a claim that defendants Captain Casiana, Trisha Anderson, Lt. Anderson, Dr. Steglia and Philip Kerch drew his blood in violation of his rights under the Fourth Amendment. (Plaintiff was also granted leave to proceed on a Fourth Amendment claim based on a urinalysis, but he clarifies in his summary judgment materials that he is challenging only the blood draw. Plt.'s Br., dkt. #35, at 8.) Now before the court is defendants' motion for summary judgment. Dkt. #26. Because I conclude that defendants are entitled to qualified immunity, I am granting the motion.

From the parties' proposed findings of fact and the evidence in the record, I find the following facts to be material and undisputed unless otherwise noted. Notably, plaintiff filed a motion objecting to defendants' reliance on an expunged conduct report and related incident report. Dkt. #34. I will grant the motion. The conduct report and incident report

1

consist of hearsay statements and I have not relied on either in setting forth the facts below.

UNDISPUTED FACTS

A. The Parties

At all times relevant to this case, plaintiff Victor Holm was incarcerated at Columbia Correctional Institution, where all defendants worked. Theodore Anderson was a supervising officer; Timony Casiana was a supervising officer II; Philip Kerch and Trisha Anderson were nurses; and Richard Steliga was a doctor.

B. January 10, 2014 Incident

On January 10, 2014, plaintiff worked a full shift in the prison wood shop. After his shift, he returned to his cell. He was exhausted and suffering from a herniated disc and shoulder injury at the time, for which he was taking Gabapentin and Ibuprofen. Plaintiff put in his ear plugs and attempted to sleep. Some time later, correctional officer Melinda Babcock was "informed by a confidential informant that [plaintiff] had not been acting normal and that he believed [plaintiff] was high." Babcock Decl., dkt. #29, ¶ 6. (Babcock provides no details about the confidential informant's tip, such as when the informant provided the information, why the informant was deemed to be reliable or whether the informant provided any details regarding how plaintiff's behavior was abnormal or why he believed plaintiff was "high.") Babcock went to plaintiff's cell. (The parties dispute what Babcock observed. According to Babcock, plaintiff was struggling to sit up straight, had

2

"glazed" eyes and was avoiding eye contact. Babcock says she asked plaintiff how he was doing, but he did not respond. However, plaintiff says he never saw Babcock come to his cell because he fell asleep shortly after returning from work.)

After leaving plaintiff's cell, Babcock reported her purported observations to the on-duty sergeant, Sergeant Bartz, who went to check on plaintiff. Bartz arrived at plaintiff's door while plaintiff was sleeping with ear plugs in. Bartz kicked plaintiff's door. As soon as plaintiff heard Bartz, he immediately stood up. Bartz never spoke to plaintiff. (Defendants did not submit a declaration from Sergeant Bartz regarding his observation of plaintiff and rely only on hearsay evidence to describe Bartz's interactions with plaintiff. Therefore, I have not considered defendants' proposed findings of fact regarding Bartz's observations for purposes of summary judgment.)

Babcock and Bartz later told defendant Lt. Theodore Anderson that plaintiff "was not acting normally and was possibly on some kind of intoxicant." Lt. Anderson Decl., dkt. #30, ¶ 8. Anderson went to plaintiff's cell with Bartz and two correctional officers and removed plaintiff from his cell and brought him to the day room. In the dayroom, Anderson observed that plaintiff could not keep his eyes open or focus on what was being said and was unable to maintain his balance. Anderson did not believe plaintiff was "acting like himself" and believed plaintiff was under the influence of intoxicants. Id. ¶¶ 18-19. (According to plaintiff, if he was acting strangely it was because he was exhausted and taking strong pain medication.) Anderson took plaintiff to the restrictive housing unit, where defendant Nurse Philip Kerch conducted a medical evaluation.

3

Defendant Kerch's "nursing encounter protocols" assessed plaintiff with "no abnormalities" in multiple areas and noted that plaintiff could perform multiple squats. Dkt. #40-5. (Defendant Kerch did not submit a declaration.) Defendant Trisha Anderson, another nurse, says that Kerch told her that plaintiff was not experiencing a "medical emergency" but was "displaying odd behavior." Trisha Anderson Decl., dkt. #31, ¶ 5. (Because Kerch did not submit a declaration, his alleged statements can be considered only for their effect on Anderson and cannot be considered for the truth of the matter asserted.) Nurse Anderson then spoke with defendants Lt. Anderson and Captain Casiana, who told her they suspected plaintiff was under the influence of intoxicants. Defendants Nurse Anderson, Lt. Anderson and Casiana agreed that plaintiff should be tested for intoxicants.

Defendant Nurse Anderson called the on-call physician, defendant Dr. Steglia, about her discussion with defendants Lt. Anderson and Captain Casiana. Nurse Anderson says that Steglia gave her a verbal order to take a urinalysis and blood sample from plaintiff and directed her to send the sample to Divine Savior Hospital for toxicology testing. (Defendants did not submit a declaration from Steglia, so any statements attributed by him may be considered only for their affect on Nurse Anderson and may not be considered for the truth of the matter asserted.) Nurse Anderson told plaintiff about Steglia's order and plaintiff responded that he did not want the blood test. (Nurse Anderson says that she told plaintiff he would need to sign a "Refusal of Recommended Health Care" form if he refused the test, which prompted plaintiff to consent to both the blood and urine sample. Plaintiff agrees that he consented to a urinalysis, but denies ever consenting to a blood test. He says

4

that he repeatedly told defendants that taking a blood test was a violation of his constitutional rights and department policy.)

The urinanalysis apparently tested positive for amphetamines and plaintiff was given a conduct report. However, the conduct report was later expunged because defendants failed to retest the sample. Plaintiff was never provided a copy of the blood test results and defendants have not submitted any evidence regarding the results of the blood test.

OPINION

Plaintiff contends that defendants violated his rights under the Fourth Amendment by taking a blood sample without a warrant, consent or probable cause. As an initial matter, plaintiff makes several arguments about whether defendants violated the Department of Adult Institution drug testing policies as set forth in DAI Policy 306.17.01. As plaintiff points out, the DAI policy seems to contemplate urine testing only, not blood draws. However, whether defendants complied with department policies is not determinative of whether defendants violated the Fourth Amendment. Whitman v. Nesic, 368 F.3d 931, 936, n.1 (7th Cir. 2004) ("[T]he mere fact that state rules or statutes are violated does not in and of itself amount to a constitutional violation or give rise to an actionable § 1983 claim."). Thus, I will not consider the drug testing policy further.

The question under the Fourth Amendment is whether the blood draw violated plaintiff's right to be free from unreasonable searches and seizures. Plaintiff argues that the blood draw was objectively unreasonable because defendants had no reasonable suspicion

that he was intoxicated by an unlawful substance. He argues that the statement from the alleged confidential informant is vague and unreliable, defendants have misrepresented plaintiff's behavior and, even if he was acting tired or confused, defendants should have attributed his behavior to his exhaustion from working and his prescription pain medications, particularly because he has no prior history of drug use in prison.

Defendants disagree, arguing that the blood draw was objectively reasonable because it was minimally invasive, they had received a confidential tip, their own observations provided a legitimate basis for suspecting that plaintiff was intoxicated and they had a legitimate governmental interest in investigating the presence of drugs in the prison. Defendants further argue that even if they violated plaintiff's Fourth Amendment rights, they are entitled to qualified immunity.

The Supreme Court has cautioned lower courts to "think hard, and then think hard again," before addressing the merits of an underlying constitutional claim when a defendant has raised a qualified immunity defense. District of Columbia v. Wesby, 138 S. Ct. 577, 589, n.7 (Jan. 22, 2018) (citing Camreta v. Greene, 563 U.S. 692, 707 (2011)). Therefore, I will start by addressing qualified immunity.

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Carroll v. Carman, 135 S. Ct. 348, 350 (2014). "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Wesby,

6

138 S. Ct. at 589 (internal quotation marks and citations omitted). "In other words, existing law must have placed the constitutionality of the [defendants'] conduct 'beyond debate.'" Id. "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (citation omitted).

Applying this standard, I conclude that defendants are entitled to qualified immunity because it was not clearly established that the Fourth Amendment prohibited defendants from taking a blood sample from plaintiff under the circumstances as they existed at the time of the draw. Outside the prison context, a warrantless blood draw clearly implicates the Fourth Amendment. Missouri v. McNeely, 133 S. Ct. 1552 (2013). However, because plaintiff is a convicted prisoner, he has only a limited right to privacy under the Fourth Amendment. Hudson v. Palmer, 468 U.S. 517, 530 (1984) (Fourth Amendment gives prisoners no expectation of privacy with respect to contents of cells). The Court of Appeals for the Seventh Circuit has explained that the Fourth Amendment "protects, to some degree, prisoners' bodily integrity against unreasonable intrusions into their bodies." King v. McCarty, 781 F.3d 889, 900 (7th Cir. 2015). However, neither the Supreme Court nor the court of appeals has provided clear guidance for determining the situations in which the Fourth Amendment applies to searches of prisoners or the standards to be applied to evaluate whether there has been a Fourth Amendment violation.

In many cases involving Fourth Amendment challenges raised by prisoners, the Court of Appeals for the Seventh Circuit, as well as courts in other circuits, have cited Bell v. Wolfish, 441 U.S. 520, 559 (1979), for the general rule that a the reviewing court must

"balanc[e] the need for the particular search against the invasion of personal rights that the search entails." See, e.g., King, 781 F.3d at 899 (citing Bell in case challenging jail's use of transparent jumpsuits); Canedy v. Boardman, 16 F.3d 183, 186 (7th Cir. 1994) (citing Bell in case involving inmate challenge to strip searches performed by guards of the opposite sex); Harris v. Miller, 818 F.3d 49, 57 (2d Cir. 2016) (applying Bell to inmate's Fourth Amendment challenge to visual body cavity search); King v. Rubenstein, 825 F.3d 206, 215 (4th Cir. 2016) (applying Bell to prisoner's challenge to coerced surgery); Sanchez v. Pereira-Castillo, 590 F.3d 31, 42-43 (1st Cir. 2009) (applying Bell to prisoner's Fourth Amendment challenge to body cavity search and forced surgery).

The rule from Bell v. Wolfish is a general rule, however, and does not clearly answer the question whether defendants' ordering a blood draw from plaintiff was objectively reasonable under the circumstances of this case. Nor has plaintiff cited any case that "clearly establishes" that requiring him to submit to blood draw under the circumstances amounted to a constitutional violation. If I accept plaintiff's version of events as true, as I am required to do at summary judgment, defendants' decision to require a blood test was based on an informant's statement that plaintiff might be "high," along with plaintiff's failure to wake up promptly when approached by officers and his acting tired and unfocused when confronted by defendant Lt. Anderson. Defendants thought the blood draw was necessary to determine whether plaintiff had taken illegal drugs. Although I agree with plaintiff that this is a somewhat flimsy basis for requiring a blood draw, plaintiff has cited no case and I have found none to support plaintiff's claim that a blood draw of a convicted prisoner under

8

similar circumstances amounts to a Fourth Amendment violation. Instead, courts facing similar factual scenarios have concluded either that no constitutional violation has occurred or that the defendants are entitled to qualified immunity. For example, in Sparks v. Stutler, 71 F.3d 259, 261 (7th Cir. 1995), the court considered whether prison officials violated the Fourth Amendment when they used a catheter to obtain a urine sample from a prisoner suspected of drug use after a syringe had been found in his shoe. The court did not resolve the question, but instead affirmed summary judgment for the defendants on the ground that the law on the issue was not clearly established, so the defendants were entitled to qualified immunity. Id. at 262. See also Sullivan v. Bornemann, 384 F.3d 372, 377 (7th Cir. 2004) (finding no Fourth Amendment violation when officers restrained the plaintiff during catheterization that was part of medical clearance procedure.); Carter v. Huterson, 831 F.3d 1104, 1107–08 (8th Cir. 2016) (holding that defendants were entitled to qualified immunity on Fourth Amendment claims based on warrantless collection of blood sample from civilly committed individual); Inman v. Hatton, No. 17-CV-06612-SI, 2018 WL 1100959, at *4 (N.D. Cal. Mar. 1, 2018) ("Requiring inmates to provide urine samples for random mandatory drug testing, and non-random drug testing that is not intended to harass an inmate, are reasonable under the Fourth Amendment.")

In sum, the legal standard for evaluating bodily searches of prisoners, and blood draws in particular, is not "sufficiently clear" to support a conclusion that "every reasonable official would understand that" requiring plaintiff to submit to a blood draw under the circumstances of this case was unlawful. Wesby, 138 S. Ct. at 589. Thus, defendants are

9

entitled to qualified immunity. Therefore, I will grant their motion for summary judgment.

ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by defendants Lt. Anderson, Trisha Anderson, Captain Casiana, Philip Kerch and Dr. Steglia, dkt. #26, is GRANTED.

2. Plaintiff Victor E. Holm's motion to object to documentation, exhibits or references, dkt. #34, is GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 19th day of March, 2018.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge